UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

RYAN NOAH SHAPIRO,           )
                             )
            PLAINTIFF        )   Civil Action No. 1:13-cv-729 (PLF)
    vs.                      )
                             )
DEPARTMENT OF JUSTICE,       )
                             )
            DEFENDANT        )
                             )

**PLAINTIFF'S RESPONSE TO "DEFENDANT'S SUPPLEMENTAL REPLY IN
SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT"**

I. Adequacy of the Search

Plaintiff argued in his previous brief that the FBI failed to conduct a search reasonably designed to locate all responsive records. Specifically, Plaintiff argued that (1) an ACS UNI (index) search was not reasonably designed to locate all responsive records in the CRS; and (2) the FBI failed to search databases outside of the CRS.

The FBI responded in its Supplemental Reply brief by asserting that searches of the CRS using other methods (i.e., ECF full-text search, Sentinel search, ICM, and IDW/DIVS search) would be duplicative. The FBI further asserted that ACS has not been replaced by Sentinel, and that an ACS search is still appropriate because new cases are "back-filled" into ACS when they are created in Sentinel. The FBI still further asserted that DIVS is an analytical tool that is not appropriate for a FOIA search. Finally, the FBI has asserted that since it has now processed the entire case file on Aaron Swartz, further searches are not likely to locate responsive records. Plaintiff responds to each argument in turn.

1

1. Whether further searches of the CRS would be duplicative

The shortcoming of conducting an ACS UNI search is that it will only locate records about subjects that have been specifically indexed to that subject. Thus, as the present case demonstrates, an ACS UNI search may fail to locate a significant volume of records that are about the subject of an investigation if the Special Agent (or his or her subordinate) does not, in their discretion, index those records. Defendant argues that this is an indexing issue, not a search issue. This argument misses the point. An ACS UNI search is inadequate precisely because of problems with indexing. When there are other search tools available that do not suffer from this shortcoming, it is unreasonable for the FBI to limit its search of the CRS to use of ACS UNI. These other search tools are better at searching CRS and therefore are likely to locate additional responsive records.

Plaintiff has recently obtained training material from the FBI that demonstrates that an ECF search through Sentinel is appropriate in "[c]ases marked high visibility" and in cases where a supervisor directs such a search. (Ex. 5.) This training material suggests that an ECF search through Sentinel is not duplicative, and is not impracticable.

2. Whether ACS has been replaced by Sentinel

The parties dispute whether ACS has been replaced by Sentinel. Mr. Hardy's declaration says it has not. An FBI press release says it has. [ECF dkt: 28-4] ("Deployment of the Sentinel application in July 2012 represented a pivotal moment for the FBI: the application replaced the legacy Automated Case Support System[.]") The court need not resolve this dispute, however, because even if ACS continues to exist, Mr. Hardy has himself explained how Sentinel is superior for processing FOIA requets:

"Currently, the FBI is taking two steps to update its technology and facilities that have the potential to reduce dramatically the amount of time it takes the FBI to respond to FOIA and Privacy Act requests: (a) development of the electronic investigative case file (the Sentinel Project) and (b) establishment of an FBI Central Records Complex. The Sentinel Project is an on-going, multi-year project that will result in the elimination of paper investigative case files. With an embedded Records Management Application ('RMA'), FBI employees will be able to earch for and retrieve these records electronically . . . . **These initiatives will significantly improve RIDS's search and record retrieval capabilities by increasing search accuracy, by decreasing search time, by reducing lost files and missing serials, and eliminating the manual movement of files.** RIDS expects these initiatives, after they are fully implemented, to reduce by 40% the time required to process a FOIA/Privacy Act request. Phase One of the Sentinel Program is scheduled to be launched in the spring of 2007."

(Ex. 1 at 4-5 ¶ 9) (emphasis added). Additionally, a Privacy Impact Assessment (PIA) on Sentinel issued by the FBI states: "SENTINEL provides web-based access for all authorized users and an improved search and indexing capability, yielding access to all relevant data to which the user is permitted access." (Ex. 2 at 1.) Since Sentinel went live in 2012, FBI has "begun using Sentinel as a tool for FOIA processing in certain instances." (Ex. 8 at 11, ¶ 23) For example, a Sentinel search for records about an individual was performed in response to a challenge to the adequacy of the FBI's search in *Henry, et al. v. DOJ* (Ex. 3 at 6, ¶ 8.)

3. Use of DIVS for FOIA

Plaintiff is not asking the FBI to perform any analysis on information, but rather to use DIVS for its search capabilities. Indeed, searching is the purpose for which DIVS was developed: "The purpose of the DIVS investment is to make all FBI intelligence and investigative data available and searchable . . ." (Ex. 6 at 1.)

3

An FBI press release states that DIVS "will allow users to search for a name, phone number, or other identifiers and find all cases referencing the information." (Ex. 4.) The press release explains that prior to the advent of DIVS, "For special agents and intelligence analysts, finding specific pieces of missing information in an investigation can be very complicated. The process involves searching through hundreds of databases with individual passwords, manually compiling information from each source, and then trying to sift through the collected information for the missing link. It is like trying to find a needle in a haystack." (Ex. 4.) Now, the FBI has "a new tool which encompasses the Bureau's most-used databases while providing a single-source search capability that pulls information directly from hundreds of databases and datasets called the Data Integration and Visualization System (DIVS). DIVS provides the capability to search some of the most-used databases, accessing hundreds of millions of documents, all from one location." (Ex. 4.)

Thus, DIVS has extensive search capabilities and is superior to other search programs because it provides the ability to search "hundres of databases and datasets," whereas ACS UNI can search only one – the CRS – and does not even allow for a search of the entire CRS. *Negley v. FBI*, 658 F. Supp. 2d 50, 58 (D.D.C. 2009) ("Defendant searched only one component of CRS, the UNI file system. . . As already noted, the UNI database is searchable only by indexed terms, which are identified at least in part by discretionary decisions left to case agents who may have limited knowledge.") Because DIVS has the ability to search hundreds of databases and datasets, it allow for more accurate and comprehensive search results, according to a Department of Justice Systems of Records Notice (SORN) for DIVS: "Historically, FBI personnel searched individual databases to

extract relevant information and then compared the extract to other available information in order to form a more complete and accurate threat picture. This was a time-consuming process and led to possible gaps in the collated information . . . . The Data Integration and Visualization System, DIVS, will allow authorized system users to more effectively search . . . relevant information in support of the FBI's multifaceted mission. DIVS will provide users with the ability to simultaneously conduct searches across several databases[.]" 75 F.R. 53,342-45 (Aug. 31, 2010).

    It is not unprecedented to use search tools that were not designed for processing FOIA requests in order to process FOIA requests. Indeed, the index to CRS (UNI) was not designed for responding to FOIA requests, but was instead designed to assist FBI Special Agents in conducting their investigations. As Mr. Hardy has previously pointed out, "It is also important to remember that the CRS is indexed in a manner which meets the FBI's investigative needs and priorities, and allows FBI personnel to reasonably and adequately locate pertinent files; accessing the CRS to locate files responsive to FOIA and Privacy Act requests is an incidental and secondary use of the CRS." (Ex. 7 at 4 ¶ 5.) Further, the DOJ SORN cites as being routine uses of DIVS a number of non-law-enforcement purposes, such as providing information:

> "M. To a Member of Congress or staff acting upon the Member's behalf when the Member or staff requests the information on behalf of, and at the request of, the individual who is the subject of the record.
>
> N. To an actual or potential party to litigation or the party's authorized representative for the purpose of negotiation or discussion of such matters as settlement, plea bargaining, or in informal discovery proceedings.
>
> O. To the news media and the public, including disclosures pursuant to 28 CFR 50.2, unless it is determined that

> release of the specific information in the context of a
> particular case would constitute an unwarranted invasion of
> personal privacy."

75 F.R. at 53344.

When Congress passed the E-FOIA Amendment Acts, it explicitly indicated that it desired for agencies to use the latest search technologies to locate responsive records. *See* Electronic Freedom of Information Act Amendments of 1996, P.L. 104-231, 110 Stat. 3048 § 2(a) ("The Cognress find that– . . . (6) Government agencies should use new technology to enhance public access to agency records and information.") It would therefore be inconsistent with FOIA to permit the FBI to rely solely upon older, less reliable technology when it has the ready ability to also use newer, better systems.

4. Whether all responsive records have been located

There is affirmative evidence in the record that responsive records exist that have yet to be produced to Plaintiff. One of the released pages indicates that a search of ACS for Aaron Swartz's web site "was positive for case ID 315-HQ-C1475879-IP, serial 91."[1] [ECF dkt: 28-10 at 88.] This reference to another case file means that further searches are likely to return responsive records. Further, the FBI has ignored this lead, in violation of its requirements under FOIA.

---

[1] The case ID number may include "HO" rather "HQ." It is difficult to discern as the bottom portion of the letters are cut off by a redaction box.

II. Redactions

A.  Exemption 3

Although the D.C. Circuit has held that Fed. R. Crim. Pro. Rule 6(e) is a relevant statute within the meaning of FOIA Exemption 3, a court must still conduct an inquiry into "whether information withheld on that basis is actually included within the reach of the rule." *Fund for Constitutional Government v. National Archives & Records Service*, 656 F.2d 856, 867-68 (D.C. Cir. 1981).  Under Rule 6(e), secrecy attaches to "matter[s] occurring before the grand jury," Fed. R. Crim Pro. Rule 6(e)(2)(B), but the rule "does not require . . . that a veil of secrecy be drawn over all matters occurring in the world that happen to be investigated by a grand jury." *SEC v. Dresser Industries, Inc.*, 628 F.2d 1368, 1382 (D.C. Cir. 1980)(*en banc*).

It is true that "'matters occurring before the grand jury' as specified in Rule 6(e) may encompass documents, as well as grand jury transcripts.  However, documents are not cloaked with secrecy merely because they are presented to a grand jury. Indeed, requests for documents that have been subpoenaed by a grand jury necessitate different and less exacting considerations than requests for grand jury transcripts, especially when such documents were in existence prior to the inception of the grand jury investigation." *Alexander v. FBI*, 186 F.R.D. 102, 108 (D.D.C. 1998)(internal citations omitted).

In this case, the FBI withheld "copies of specific records received in response to a federal grand jury subpoenas." (Third Hardy Decl. ¶ 18.) Unlike a grand jury subpoena itself, copies of records received in response to a grand jury subpoena are not categorically protected from withholding. *Compare Lopez v. DOJ*, 393 F.3d 1345, 1350 (D.C. Cir. 2005) ("All grand jury subpoenas . . . fall within FOIA's third exemption")

*with Senate of Puerto Rico ex rel. Judiciary Comm. v. United States DOJ*, 823 F.2d 574,583-84 (D.C. Cir. 1987) ("There is no *per se* rule against disclosure of any and all information which has reached the grand jury chambers[.]") In *Senate of Puerto Rico*, this Court explained that the agency affidavit in that case "sa[id] little more than that the material has been presented to the grand jury; unless this fact alone automatically exempts the material, a position we reject, it is incumbent upon us to require some affirmative demonstration of a nexus between disclosure and revelation of a protected aspect of the grand jury's investigation." 823 F.2d at 584. The Court observed that because the FOIA request was not limited to grand jury materials, "had the DOJ released these exhibits, along with the over 1,000 pages of non-grand jury material it did release, there is nothing in this record to suggest that the Senate, or any third party, would have been able to determine *which* documents had been submitted to the grand jury. Absent that identifying information, it is difficult to see how disclosure would reveal anything concerning the inner workings of the grand jury." *Id.* at 583 (emphasis in original).

    The same can be said here. The Hardy declaration fails to provide any more information than the fact that the withheld material consists of "copies of specific records received in response to a federal grand jury subpoenas," as if the fact that the material was obtained via a grand jury subpoena necessarily means that disclosure would reveal a protected aspect of the grand jury's investigation. If the FBI had released the withheld documents along with the hundreds of other pages it did release to Mr. Shapiro, there is nothing in the record to suggest that any third party could determine which documents had been submitted to the grand jury. *See id.* at 583; *Wash. Post Co. v. United States*

*Dep't of Justice,* 863 F.2d 96 (D.C. Cir. 1988) ("the document itself must reveal the inner workings; the government cannot immunize a document by publicizing the link.")

Further, the Hardy declaration avers only that disclosure of this information "*could* reveal the inner workings of a federal grand jury" and therefore "would *clearly* violate the secrecy of the grand jury proceedings" (Hardy Decl. ¶ 18) (emphasis added). Just last year, the D.C. Circuit rejected similarly vague and conclusory language as insufficient to support the withholding under Exemption 3 of documents presented to a grand jury. *Citizens for Responsibility & Ethics in Wash. v. United States DOJ*, 746 F.3d 1082, 1100 (D.C. Cir. 2014) ("But we are told only that the requested documents contain information that '*could* be used as evidence before a Federal Grand Jury' or '*may* be subpoenaed by a Federal Grand Jury' and therefore that 'any such disclosure would *clearly* violate the secrecy of the Grand Jury proceedings.' Hardy Decl. 20, 24 (emphases added). This conclusory explanation is insufficient.") *See also Stolt-Nielsen Transp. Grp. LTD. v. United States*, 534 F.3d 728, 732 (D.C. Cir. 2008) (rejecting as insufficient agency's declaration that withheld materials "are grand jury exhibits, reveal information discussed before the grand jury, and were created for the purposes of the investigations at issue")

This Court has previously rejected an almost identically worded affidavit from Mr. Hardy in another case, and should do the same here. *See Boehm v. FBI*, 948 F. Supp. 2d 9, 28 (D.D.C. 2013) (finding vague and insufficient statement in Hardy declaration describing withheld document as "Information obtained pursuant to Federal Grand Jury subpoena.")

Finally, it is unclear from the *Vaughn* declaration how the FBI obtained the information it seeks to withhold.  Because "Rule 6(e)'s prohibition on disclosure applies

only to individuals who have had access to that information by virtue of their relationship to the grand jury investigation or under another provision of the rule," *Fund for Constitutional Government*, 656 F.2d at 870, n.33, the mere fact that the FBI possesses records that were subpoenaed by the grand jury will not insulate the documents from disclosure.

B. Exemption 7(E)

The Defendant has redacted the results/printouts of several searches of records databases. In explaining the redactions, Mr. Hardy does not provide the name of the database(s); the number of databases redacted; an indication of whether or not these databases are known to the public; an indication of whether the information collected in the database(s) is of a type not known by the general public to be accessible to the FBI; or any explanation of how disclosure of the redacted information would assist criminals in circumventing the law.

Despite the lack of information from Mr. Hardy, one page of the produced records itself states that Accurint is the source of at least one of the printouts (Swartz-91) ("A search of Accurint provided the following information: [REDACTED]." Accurint for Law Enforcement and similar public database searches are well-known and widely used law enforcement search tools. (Ex. 9.) In the present case Defendant claims that disclosing that the FBI used Accurint or other public database searches will enable "criminals to employ countermeasures to avoid detection." (Third Hardy Decl. ¶ 20.) The method of using Accurint or other searches is not revealed in the produced documents and it is widely known that the FBI can use Accurint and other tools to search

all public databases. That information can be found on LexisNexis' Accurint for Law Enforcement promotional website, http://www.lexisnexis.com/government/solutions/investigative/accurint-le.aspx. Disclosure of which searches were used would not help any criminals evade the law because it would not reveal any additional countermeasures that could be employed to escape one's information being kept in Accurint.

It is not clear whether any databases other than Accurint are at issue. However, if there are, the FBI needs to provide further information supporting its withholding. At a minimum, the FBI should explain whether the withheld information is from database(s) whose existence is known to the public, and if so, which databases. The FBI should also explain whether it is generally known to the public that the FBI collects the type of information contained in the database(s). Without this information, Plaintiff cannot reasonably be expected to challenge this withholding as to any of the databases other than Accurint for Law Enforcement.

                                  Respectfully Submitted,

                                  _/s/ Jeffrey Light_____

                                      Jeffrey L. Light
                                      D.C. Bar #485360
                                      1712 Eye St., NW
                                      Suite 915
                                      Washington, DC 20006
                                      (202)277-6213
                                      Jeffrey.Light@yahoo.com

                                      *Counsel for Plaintiff*